1
2
3
4
5                        UNITED STATES DISTRICT COURT
6                        NORTHERN DISTRICT OF CALIFORNIA
7
8
9    FONDA J. HOUSTON,
10              Plaintiff,                       No. C 04-4443 PJH
11        v.                                     **ORDER GRANTING DEFENDANTS'
                                                 MOTION FOR SUMMARY JUDGMENT**
12   REGENTS OF THE UNIVERSITY OF
     CALIFORNIA, et al.,
13              Defendant.
14   _____/

15        Defendants' motion for summary judgment came on for hearing on March 22, 2006.

16   Plaintiff appeared by her counsel Richard M. Rogers, and defendants appeared by their

17   counsel Marcie S. Isom.  Having read the parties' papers and carefully considered their

18   arguments and the relevant legal authority, and good cause appearing, the court hereby

19   GRANTS defendants' motion as follows.

20                                **BACKGROUND**

21        This is an employment case alleging disability discrimination, failure to

22   accommodate, retaliation, and harassment.  Plaintiff Fonda J. Houston was employed by

23   defendant Regents of the University of California ("the Regents" or "the University") from

24   1986 until she was terminated on May 11, 2004.

25        For some period prior to March 2001, plaintiff worked as Accounts Receivable

26   Supervisor for Public Safety and Transportation on the campus of the University of

27   California at Berkeley ("UCB").  In that job, she supervised two to nine employees at any

28   given time.

**United States District Court**
For the Northern District of California

1    On March 1, 2001, plaintiff began working in UC's Office of the President ("UCOP")

2  as an Administrative Specialist in the Policy and Planning Unit of the Information

3  Resources and Communication ("IR&C") Department.  Her primary duty in the new job was

4  to provide general accounting and support for the IR&C Department.  Plaintiff testified that

5  she sought a transfer because she wanted to complete her bachelor's degree, and didn't

6  want a job where she had the responsibility of supervising other people.  There is no

7  evidence that plaintiff had any performance problems prior to her employment in UCOP.

8    Plaintiff was hired for the position by Principal Analyst Bjoern Jeker ("Jeker"), who

9  was also supposed to be plaintiff's new supervisor.  However, Jeker left UCOP on March

10  16, 2001.  After that date, plaintiff's supervisor was defendant Heidi Hoffman ("Hoffman'),

11  the Administrative Services Manager.

12    About three weeks after plaintiff began working in the IR&C Department, she began

13  complaining about her new job, primarily because she felt that it was not challenging

14  enough.  In May 2001, plaintiff began reporting directly to Terrence Ireland ("Ireland"), who

15  was newly hired and who reported directly to Hoffman.  Plaintiff told Hoffman and Ireland

16  that she thought the job was "beneath her" and that she planned to return to her prior

17  department at UCB.  During her first two or three months in IR&C, she began taking

18  administrative leave with pay to interview for other positions.

19    Plaintiff states in her declaration that "[t]he job was not what I expected, and Heidi

20  Hoffman's management style, particularly her yelling, upset me and made me ill."  She

21  claims that around May 2001, she began experiencing stomach pains and various intestinal

22  problems, and that at some point she also began experiencing panic attacks.  Eventually

23  these conditions developed into the illnesses that provide the basis for her claim of

24  disability – irritable bowel syndrome (IBS) and anxiety/panic condition.  Plaintiff asserts that

25  these conditions were triggered by Hoffman's "yelling" at her because she was seeking

26  other employment.  Plaintiff also claims that Hoffman "micro-managed her," and that

27  everything she (plaintiff) did came under "heightened scrutiny."

28    Plaintiff made numerous requests for sick leave and for leave for other, non-medical

2

**United States District Court**
For the Northern District of California

reasons.  Many of the requests were made on the day of the absence, or even after the fact.  In the fall of 2001, after conferring with Hoffman, Ireland spoke to plaintiff about the need to schedule planned absences in advance.  According to Ireland, plaintiff responded that he could not tell her when she could or could not miss work.

On May 23, 2002, Ireland issued plaintiff's annual performance evaluation for the period March 1, 2001, through February 28, 2002.  In the evaluation, Ireland noted that plaintiff mostly met, and sometimes exceeded, expectations for her specific job responsibilities (with the exception of "[m]aintain organized files for both reconciled and unreconciled invoices" and "[m]aintain copies of appropriate documentation in files"), and he recognized strengths in her overall performance.  However, under "Areas for Improvement," he stated,

> Fonda tends not to go beyond the defined scope of her job.  She approaches her responsibilities from the perspective that she only does "what she is told." While she performs the basic responsibilities of her position well, she could be even more effective if she were more pro-active – asking questions, using her own judgment – rather than responding to direction.

> Fonda has poor attendance, including an unacceptable number of unscheduled absences.  Some of these can be attributed to circumstances beyond her control (such as sick leave, family leave, etc.), but many are the result of appointments or other events that could have been anticipated.  She should strive to get approval for all planned absences as far in advance as possible, and to keep the number of unscheduled absences to a minimum.

Plaintiff took exception to these comments, and, according to Ireland, considered that she had been inappropriately and unfairly "written up."  In the space on the evaluation for "employee comments," plaintiff stated that she had requested a job description on her first day on the job, and had been provided with an "outdated" and "generic" job description. She claimed, essentially, that she was being unfairly evaluated on her job performance when she had never received an accurate job description.  In response to the charge of excessive absenteeism, plaintiff responded,

> I have a medical condition that I was diagnosed with while working in this position.  I have a note from my doctor on file.  My doctor say's [sic] that my condition is brought on by stress and anxiety.  For health reasons, I have found the need to remove myself from this (sometime) chaotic working environment.  If any of my absences could have been anticipated I would

3

1    have requested the time off well in advance to avoid receiving (on some
     occasions) leave without pay.  In my past positions attendance has never
2    been a problem.

3    She ended with a promise to "continue to do what is expected of me while adhering to

4    University guidelines and procedures," and to "make every effort to convey to my

5    supervisor any obligations that I may have that will require my absence from work."  She

6    added, however, that "things happen beyond my control" because of the fact that she was

7    a single mother of three and a full-time college student.

8          On May 29, 2002, less than a week after receiving the performance evaluation,

9    plaintiff sent Hoffman an e-mail requesting that the evaluation be removed from her

10   personnel file or revised to delete the comment that "she only does what she is told" and

11   the comments regarding her spotty attendance.  Plaintiff argued that she had shown

12   initiative in her performance of her job duties, citing to examples of new procedures she

13   had implemented, and reiterated that she awaited "clarity" regarding her duties and

14   responsibilities overall.  In response to the charge of excessive absenteeism, plaintiff wrote,

15         As far as my attendance is concerned, I did use (necessary) time away from
           work.  In this position, I have allowed people to upset me to the point that
16         their mere presence causes me undo [sic] stress.  I have come to the
           realization that I cannot run away from confrontations.  I need to address
17         adversities head on.  I am sure that if an attendance policy was made
           available I would have come to this realization sooner.  I would have seen
18         what was expected of me and as a result I would have dealt with work related
           issues sooner then [sic] now and saved my accrued hours and avoided a
19         negative evaluation. . . . I don't understand how my attendance could be rated
           as "poor."  I don't know what standards to which I was being measured
20         against.  All assignments and deadlines were reached and I was not informed
           of any complaints of people not being able to reach me.  As a result, I feel an
21         attendance rating of "poor" is unjustified.

22         Although plaintiff stated in her May 23, 2002, comments on the performance

23   evaluation that she had "a medical condition that I was diagnosed with while working in this

24   position" and that she had "a note from my doctor on file," there is no evidence of any

25   diagnosis or doctor's "note" as of the date of the evaluation.  Her statement that her

26   condition was "brought on by stress and anxiety" was repeated in the May 29, 2002 letter,

27   but was not supported with any medical documentation.

28         Following several medical appointments during the succeeding four weeks, plaintiff

4

United States District Court

For the Northern District of California

1  advised Ireland that she had a "serious medical condition," although she still did not reveal

2  the diagnosis, the severity of the condition, or the anticipated duration of the recovery

3  period.  Ireland states that when he suggested that plaintiff seek counseling for the "stress,"

4  plaintiff told him she found his suggestion "offensive and degrading."  She testified in her

5  deposition that she believed Ireland "was trying to be offensive and degrading," and that the

6  suggestion that she seek counseling was offensive and degrading because she hadn't

7  demonstrated the need to seek counseling and because Ireland was not a medical

8  professional who was qualified to assess her mental or emotional state.

9       Ireland also arranged for plaintiff to be provided with workers' compensation claim

10  forms and a UC Family Medical Leave packet, which contained a statement of employee

11  rights under the FMLA, copies of UC's leave of absence policy and the procedures for

12  obtaining leaves of absence, plus various forms for medical leave certification.  Plaintiff

13  apparently applied for workers' compensation on May 29, 2002.

14       On June 12, 2002, in a meeting with Manager of Empoyee-Labor Relations and

15  Vocational Rehabilitation Services, Shar Caldwell ("Caldwell"), plaintiff asked to be moved

16  to a different position, preferably at UC, as a "reasonable accommodation" for her health

17  problems.  She subsequently made numerous requests to be "transferred" or "moved

18  away" from Hoffman and Ireland.

19       Plaintiff subsequently went on FMLA leave for the period June 17, 2002, through

20  August 21, 2002.  On August 5, 2002, she was evaluated by Danilo V. Lucila, M.D., in

21  connection with her workers' compensation claim.  Dr. Lucila, a psychiatrist, examined

22  plaintiff with regard to psychiatric issues.  He diagnosed panic disorder without

23  agoraphobia, occupational problems, and "[i]rritable bowel syndrome, self-reported."  He

24  stated that the panic disorder had developed in June 2002, following the issuance of the

25  May 2002 performance evaluation – "a performance evaluation that she did not agree with."

26  He noted that plaintiff "has been in treatment for this, and apparently has been making

27  progress," and was being "released to return to duty with no restrictions effective mid-

28  August 2002."  He also noted that plaintiff "has an occupational problem."  Specifically,

5

United States District Court

For the Northern District of California

"[s]he is dissatisfied with her job, and this has been an ongoing issue since it started in May 2001." He stated that while "[t]his is an issue of concern, . . . in itself [it] is not a mental illness or disorder." He found no work-related injury, but recommended that plaintiff continue with psychiatric treatment.

On August 22, 2002, plaintiff returned to work half-time. On her return, she again spoke to Caldwell to request an accommodation for her anxiety/panic condition, and also spoke to Ireland about the problem. She testified in her deposition that she told Caldwell and Ireland that there was too much noise in her work area, that she couldn't deal with the constant interruptions and micro-managing, that she needed to be moved out of that area. She told them she wanted to be moved away from Hoffman – that she could not work under Hoffman's management, because it was "triggering anxiety." She asked for a transfer "back to Berkeley." Caldwell asked her for some type of doctor's note about her condition, and plaintiff testified that she told Caldwell that she could not get any information from Kaiser because she had exceeded the allowable number of visits and "was no longer being seen in Kaiser psychiatric." She later met with Roger Howland ("Howland"), the Coordinator of Vocational Rehabilitation Programs at UC, and told him she wanted a transfer to UCB, or to be moved anywhere away from her present work environment.

Plaintiff worked half-time for the period August 22, 2002, through September 6, 2002, and then returned to FMLA leave from September 9, 2002, through October 13, 2002. Plaintiff's physician released her to return to work full-time, with no restrictions, on October 14, 2002.

During the period December 1, 2002, through mid-January 2003, Ireland became concerned because of a number of grave errors and omissions in plaintiff's work. In addition, plaintiff continued with the pattern of frequent, unapproved absences. According to Hoffman, plaintiff missed over 280 hours (35 days) of work between October 15, 2002 (when she returned from FMLA leave) and January 30, 2003. In an effort to assist plaintiff with her workload, Hoffman approved plaintiff's request to change her work hours and to have responsibility for three of her accounts transferred to two of plaintiff's co-workers.

United States District Court

For the Northern District of California

1   Ireland states in addition that during plaintiff's absences, he reviewed her in-basket to

2   ensure that critical payments were taken care of, and had another co-worker take over

3   plaintiff's job of General Ledger reconciliations; and that when plaintiff returned from her

4   leaves, he offered her additional administrative support to assist her with her workload.

5          On January 28, 2003, Ireland issued plaintiff a counseling memo, citing deficiencies

6   in her work performance and also citing excessive absences.  Ireland wrote that plaintiff

7   needed to improve in the areas of "productivity" and in the area of "unscheduled absences."

8   With regard to productivity, Ireland noted that "[i]nvoices and check requests have not been

9   processed in a timely manner, which has resulted in service termination, late notices and

10  intervention by other IR&C and UCLA staff."  With regard to absences, Ireland noted

11  that"[t]here have been numerous instances during the past 2 months of unscheduled

12  absences that demonstrate a continued unwillingness to comply with University policy and

13  expectations identified in your previous performance evaluation."  Ireland provided

14  examples of the kinds of behavior that had precipitated the counseling memo, and set

15  specific expectations in each area.

16         On May 20, 2003, as part of a new request for FMLA leave, plaintiff informed Ireland

17  for the first time that she had been diagnosed with IBS.  (It appears that plaintiff was initially

18  diagnosed with IBS in mid-2002, but she had not previously disclosed the diagnosis to her

19  supervisors at the University.)  The certification plaintiff provided at this time was a

20  statement from her doctor – Raymond L. Davis at Kaiser – dated May 20, 2003, stating that

21  plaintiff "may require" one or two days of medical leave per month to deal with the IBS.  No

22  additional restrictions were listed, and there was no showing of a need for extensive time

23  off or for some other sort of accommodation.  Ireland approved this request of up to two

24  days per month.  In addition, at plaintiff's request, the department approved a 10%

25  reduction in plaintiff's appointment,[1] which allowed her to take a day off every other week.

26         On August 11, 2003, plaintiff filed an administrative charge with the California

27  _____

28         [1]  This reduction was part of the Staff and Academic Reduction in Time ("START")
    program, which, according to plaintiff, was implemented by the University to cut costs.

United States District Court

For the Northern District of California

1    Department of Fair Employment and Housing ("DFEH") the Equal Employment Opportunity

2    Commission ("EEOC"), against the Regents, Hoffman, and Ireland, alleging disability

3    discrimination, harassment because of disability, and retaliation for taking leave under the

4    FMLA/CRLA, during the period March 2001 to January 28, 2003.  With regard to

5    harassment, plaintiff alleged only that "[b]etween March 2001 and January 28, 2003, I was

6    subjected to work environment harassment by Terrence Ireland and Heidi Hoffman and

7    written up on performance."  With regard to retaliation, she asserted, "In June 2002, I was

8    placed on leave under California family rights Act (CFRA/FMLA) due to my physical

9    disability, irritable bowel syndrome."  She adds, "Due to this condition, I was off work for

10   many days during the period and Mr. Ireland, Principal Administrative Analyst, wrote me up

11   and stated that it was a period of low performance and poor attendance."  She did not state

12   any facts in the administrative charge to support a claim of discrimination, apart from the

13   claim of harassment.

14       On August 20, 2003, plaintiff and Hoffman met to discuss a recent exchange of e-

15   mails between the two of them.  In Hoffman's opinion, plaintiff's e-mails were disrespectful

16   and bordered on insubordination.  The e-mails concerned payments for invoices for cell

17   phones used by employees.  Hoffman began the exchange by complaining to plaintiff that

18   employee David Wasley's cell phone had been disconnected because the bill hadn't been

19   paid.  Although the payment of invoices was one of plaintiff's job duties, plaintiff essentially

20   responded, "It's not my job."  Hoffman insisted that it was, and plaintiff's final message to

21   Hoffman included the statement, "At this point I am considering your actions as harassment

22   and I would like it to cease."

23       The August 20, 2003, meeting between Hoffman and plaintiff lasted for about ten

24   minutes.  Hoffman claims that plaintiff interrupted her frequently, and was loud, rude, and

25   disrespectful.  According to Hoffman, when she asked plaintiff to stop interrupting her,

26   plaintiff responded, "I'm not a child for you, as if you gonna talk down to me."  Hoffman

27   claims that plaintiff ended the meeting abruptly, saying that she had filed a complaint

28   against Hoffman with the DFEH for "harassing" her because of her medical problems.

United States District Court
For the Northern District of California

1  Plaintiff also said she didn't want to talk to Hoffman again unless someone "associated with

2  her claim" was also present.

3      Hoffman called a meeting on September 9, 2003, with plaintiff, Ireland, and plaintiff's

4  representative (Rhonda Rice).  The purpose of the meeting was to present plaintiff with a

5  letter of warning dated September 8, 2003, concerning her performance and recent

6  behavior.  At the meeting, Hoffman told plaintiff that she had repeatedly failed to ensure

7  timely payment of invoices, which had generated complaints from and disruption of service

8  throughout UCOP and caused unnecessary work for plaintiff's co-workers.  Hoffman then

9  provided plaintiff with specific examples of the failure to pay invoices in a timely manner.

10     In the letter of warning, Hoffman listed three specific performance issues – the

11  August 5, 2003, disconnect of David Wesley's cell phone due to non-payment of the

12  invoice, which was the second time this employee's phone had been disconnected for non-

13  payment; an August 11, 2003, request from a mailroom supervisor to process a $45,000

14  check for the postage meter, which check was not issued until September 2, 2003; and the

15  September 2, 2003, disconnect of the satellite cable service due to non-payment of the

16  invoice, which had been given to plaintiff in July 2003.  The letter stated that these failures

17  to pay invoices and the related performance problems had generated complaints and

18  problems, and caused unnecessary work for plaintiff's co-workers.  The letter stated further

19  that Hoffman found plaintiff's "continuing defensiveness and dismissive attitude toward

20  these problems unacceptable" and reiterated that Hoffman expected plaintiff to process

21  invoices for her area in a timely manner.

22     In the letter, Hoffman also commented on the e-mail exchange regarding the

23  payment of the invoices for the cell phones.  She described plaintiff's behavior in the

24  August 20, 2003, meeting as "rude and disrespectful," and that plaintiff's responses were

25  "insubordinate."  Hoffman reminded plaintiff that she expected plaintiff to be courteous and

26  professional in communicating with her (Hoffman) and with her other colleagues.  The letter

27  concluded with the statement that "failure to show an immediate, substantial and sustained

28  improvement in the level of your work and in your communications with all IR&C staff

9

1   members will result in further disciplinary action, up to and including dismissal."  The letter

2   also stated that plaintiff had "the right to request reviews of this action in accordance with

3   Staff Personnel Policy, #70."

4        At the September 9, 2003, meeting, after she was presented with the letter of

5   warning, plaintiff read from a prepared note.  According to Hoffman, plaintiff complained

6   that she had not been provided with an "attendance policy" or "written expectations;" that

7   she had a permanent disability and had an appointment with a "state medical examiner;"

8   and that her disability had not been properly accommodated.  Plaintiff asserted that she

9   was being subjected to continuous "e-mail and verbal harassment" by both Hoffman and

10  Ireland, and that as a result of the work environment, she had "suffered memory loss" and

11  an "inability to focus."  Plaintiff ended the meeting by stating that she had nothing further to

12  say, that she did not feel well, and that she was going home.

13       On September 10, 2003, plaintiff submitted a formal internal complaint of

14  discrimination to UC Associate Vice President Judy Boyette.  In the complaint, plaintiff

15  requested "a formal review of an unwarranted and unjustified Letter of Warning."

16       I feel my rights under Policy 12, Nondiscrimination in Employment; Section A
         of the Personnel Policies for Staff Members has [sic] been violated.  I feel as
17       though I am being discriminated against because of my mental and physical
         disability.  I initiated a complaint on 7/22/03 and one was filed on 8/11/03 with
18       the Fair Employment and Housing Agency.  In these complaints I listed Heidi
         Hoffman and Terrence Ireland as the discriminators.  I don't think they are
19       being fair in evaluating my performance standards.  I have said on several
         occasions that I am not able to perform at the same pace as prior to my
20       disability. . . .

21       I feel my rights under Policy 81; Reasonable Accommodation of the
         Personnel Policies for Staff Members has [sic] been violated.  I requested a
22       review for reasonable accommodations.  I feel a reasonable accommodation
         would include a new work site.  I have made attempts to familiarize the
23       people that I work with and for about my medical condition (which can
         become disabling at anytime).  I have spoken to Shar Caldwell on several
24       occasions in regards to my work place environment and leaving.  I have never
         been advised by anyone at UCOP about the steps in the process to be
25       considered for reasonable accommodations. . . .

26       In addition, I feel the Letter of Warning that I received is in retaliation for the
         complaint that I filled [sic] with the Fair Employment & Housing and the
27       EEOC.  I would like the University of California, Office of the President to
         execute a fact-finding investigation. . . .

28

United States District Court

For the Northern District of California

1    Plaintiff then described the onset of her IBS and anxiety disorder.  She claimed that

2    her health began to decline as early as one month after she began working in Hoffman's

3    unit, when Hoffman discovered that plaintiff wanted a transfer to another job and "started

4    screaming at me, '[Y]ou should have never taken this position if you did not plan on

5    staying.'"  Plaintiff asserted that "[t]here have been constant stares, sneers and tension

6    from [Hoffman] and her staff directed at me from that point to the present."  She claimed

7    that "stress" aggravates her condition, and asserted that "[it has been very stressful

8    working in the Administrative Unit of IR&C."  She closed by again requesting "a fact-finding

9    investigation into the above issues and policy violations."

10    The Regents' "Personnel Policies for Staff Members" or "PPSM" allows an employee

11    to file a complaint "about a specific management act which is alleged to have adversely

12    affected the employee's existing terms or conditions of employment."  Pursuant to Human

13    Resources Procedure 70 ("PPSM 70"), UCOP provides a multi-step process for

14    adjudicating complaints made regarding discrimination in employment, retaliation, and

15    failure to provide reasonable accommodation.  Paragraph VII of PPSM 70 provides the

16    procedure for "Submission of Employee Request for Review," which describes the method

17    of filing a complaint.  Paragraph IX sets forth the steps in the "Professional and Support

18    Staff (PSS) Complaint Resolution Process."

19    At Step I of the complaint resolution process, the department head issues a written

20    decision.  If the employee is not satisfied with the Step I decision, he/she may submit a

21    written appeal for further review (Step II) to the Manager of UCOP Employee and Labor

22    Relations.  If either the University or the employee requests that a fact-finder be appointed

23    to review the complaint, the complaint is forwarded to a fact-finder appointed by the

24    Manager, UCOP Employee and Labor Relations.  The appointed fact-finder must be from

25    outside the department and/or the reporting line in which the complaint arises.  The fact-

26    finder then conducts an investigation to determine the appropriate facts, which may include

27    meeting with each party in the complaint, and submits a written report to the Manager,

28    UCOP Employee and Labor Relations.  The report is forwarded to the Director, UCOP

**United States District Court**
For the Northern District of California

1    Human Resources, who then either issues a final and binding decision or remands the

2    matter back to the fact-finder for additional information and/or clarification.

3         For certain employee complaints (including nondiscrimination in employment and

4    reprisal for utilizing the complaint resolution process), where those complaints are not

5    satisfactorily resolved in the written decision at Step II, or where no written decision is

6    issued, such decisions may be appealed in writing to Step III.  Employees may then submit

7    appeals for a final and binding decision at Step III before a hearing officer, unless the

8    employee has requested a fact-finding review at Step II, in which case there is no hearing

9    and the Step II written decision is final and binding.

10        On December 29, 2003, Kristine Hafner ("Hafner"), Associate Vice President, IR&C,

11   provided plaintiff with a written "Step I Response" to plaintiff's PPSM formal complaint of

12   September 10, 2003.  Hafner noted that plaintiff had asserted that Policy 12

13   (nondiscrimination in employment) and Policy 81 (reasonable accommodation) had been

14   violated, and that she had been retaliated against.  Hafner stated that the complaint was

15   denied, and set forth the reasons.

16        With regard to the discrimination claim, Hafner stated that none of the medical forms

17   or certifications indicated that plaintiff was incapable of performing all the essential

18   functions of her job, but rather, all clearly indicated that plaintiff could perform her regularly

19   assigned duties.  She pointed to the "lone exception" – a July 10, 2002, certification by J.

20   Stern, Ph.D., which indicated that plaintiff was incapable of performing all the functions of

21   her job, but which stated no restrictions and indicated no necessary accommodations.

22   Hafner also found no indication that plaintiff had ever been disciplined or reprimanded for

23   use of sick leave or FMLA leave.

24        Hafner noted that the comments on the May 22, 2002, performance evaluation

25   regarding attendance problems were limited to plaintiff's frequent unscheduled absences

26   unrelated to sick leave or FMLA leave, and that those absences had caused delays in

27   service to the Department's customers and had also resulted in increased workload for

28   plaintiff's colleagues and supervisor.  She noted that the department had issued a

12

United States District Court

For the Northern District of California

1   counseling memo on January 28, 1993, setting forth the performance problem areas,

2   providing reasonable suggestions for correcting the problems, and articulating clear

3   ongoing performance expectations, which plaintiff should have taken as an opportunity to

4   improve her performance in the indicated areas.

5       With regard to the failure to accommodate claim, Hafner stated that she had

6   reviewed all the medical documentation submitted by plaintiff or her medical providers, and

7   noted that while Dr. Davis had indicated on May 20, 2003, that plaintiff had a "serious

8   medical condition" which "may require" 1-2 days off per month (which request had been

9   granted), each of the medical providers including Dr. Davis had authorized plaintiff to work

10  at her customary job duties without restrictions.  Hafner also found that the department had

11  granted every request plaintiff had made for time off for doctors' appointments, sick leave,

12  and FMLA leave.

13      Hafner noted in addition that the University had allowed plaintiff numerous hours of

14  paid administrative leave to attend job interviews within the University, and had

15  accommodated requests for changes in plaintiff's work hours and had transferred

16  responsibility for several accounts from plaintiff to another accounting specialist.  In

17  addition, she noted that IR&C had requested and obtained counseling support from HR to

18  facilitate better communication between plaintiff and Hoffman.  With regard to plaintiff's

19  request to work in a different location, Hafner stated that given the nature of the job

20  responsibilities plaintiff was hired to perform, and the relatively small size of the IR&C

21  administrative unit, there was no basis to change plaintiff's reporting relationship or her

22  work location, nor would such changes be feasible.

23      With regard to the claim of retaliation for filing a DFEH/EEOC complaint, Hafner

24  stated that the written letter of warning was based solely on plaintiff's well-documented

25  performance problems, the unacceptable nature of plaintiff's behavior, and the disrespectful

26  and uncooperative manner in which plaintiff communicated with her supervisors and

27  colleagues.  Hafner found no evidence that Hoffman had issued the letter of warning in

28  retaliation for plaintiff's filing an outside agency complaint.

United States District Court

For the Northern District of California

1    Meanwhile, on September 26, 2003, plaintiff was evaluated by David Cherry, M.D.,

2    in connection with her workers' compensation claim.  In his report, issued on October 24,

3    2003, Dr. Cherry diagnosed panic disorder without agoraphobia, various gastrointestinal

4    ailments (IBS, gastroesophageal reflux disease, and lactose intolerance), and "conflict with

5    supervisor."  He stated that plaintiff's panic and anxiety symptoms were "related to

6    stressors at work," and that her "current symptoms and disability are substantially related to

7    her fears about not being able to find another job because of her performance evaluation in

8    June 2002."  He also noted that if the performance evaluation had been made in good faith,

9    plaintiff's disability would not meet the standard for industrial causation of disability.

10   Dr. Cherry found that plaintiff had impairment in one area of the work function – the

11   ability to maintain a work pace appropriate to a given workload and the ability to perform

12   complex or varied tasks – but also stated that his evaluation was based entirely on

13   plaintiff's subjective report of the impairments, as there were "no objective factors of these

14   impairments."  Dr. Cherry felt that plaintiff might benefit from a course of medication to treat

15   the panic symptoms, but noted that she was unlikely to agree, because of her "dislike of

16   medication," reflected by the fact that she was no longer taking the medications previously

17   prescribed for the gastrointestinal symptoms.  He also indicated that plaintiff might benefit

18   from more frequent visits with her therapist.

19   As for recommended treatment, Dr. Cherry wrote, "Ms. Houston has returned to

20   work and I believe this is appropriate without any specific work restriction."  He deferred

21   specific recommendations for treatment of the gastrointestinal symptoms to an internal

22   medicine physician.

23   On December 16, 2003, plaintiff was evaluated by David B. Waldman, M.D., a

24   gastroenterologist.  In his report dated January 7, 2004, Dr. Waldman diagnosed a "history

25   of" IBS, "gastroesophageal reflux disease," and work-related stress, but stated that the

26   issue of the psychiatric stress claim and disability was not the subject of his report.  He

27   found that plaintiff's reported symptoms were "consistent with a pattern of irritable bowel

28   syndrome, with no prior history of gastrointestinal disease."  He added, "It is with medical

14

1    probability, as a consequence of work-related stress, Ms. Houston has developed an

2    irritable colon syndrome, and this condition is industrial in nature."  He found that she had

3    no work restrictions "on the workers' A to G schedule," but added that in terms of her IBS,

4    she "warrants a preclusion from extreme psychological stress."

5         On January 6, 2004, Ireland gave plaintiff a written performance evaluation for the

6    period March 2002 to November 2003.  Ireland gave plaintiff an overall performance rating

7    of "did not meet expectations."  He noted that while she met expectations in the "monthly

8    recharges" and "SBS processing," she did not perform her other major job responsibilities –

9    invoice processing, Filemaker updates and reconciliation, telecom processing, and filing –

10   in a way that met expectations.

11        Under "Areas for Improvement," Ireland stated,

12        In terms of the basic responsibilities of her position, Fonda needs to address
          the serious delays in invoice processing, Filemaker entry, reconciliation and
13        filing.  Additionally, to avoid service terminations in the future, she needs to be
          more diligent in monitoring past due balances and in resolving questions
14        regarding payables.  (For example, Fonda indicated that she didn't process a
          particular payable, which later resulted in termination of the service, because
15        she didn't think we could pay from a "billing statement" as opposed to an
          invoice.  However, the statement listed current charges, amount due, and a
16        remittance address.  In any event, she could have contacted A/P at UCLA to
          verify whether it could be paid, or she could have looked in the previous
17        year's files to see how the previous payment had been handled.)

18        Fonda has also become increasingly combative and disrespectful in her
          interactions with her co-workers and department management.  This behavior
19        is unacceptable in the workplace and must change.  Fonda is expected, as
          are all departmental employees, to communicate and conduct themselves in
20        a professional manner, and to be courteous and helpful, maintain a positive
          attitude, and support the team concept.
21
          In the space on the evaluation for "employee comments," plaintiff attached a
22
     statement dated January 6, 2004, in which she asserted,
23
          This evaluation is a fabrication and/or an exaggeration of what actually
24        occurred.  I filed a complaint with the Fair Employment & Housing and the
          EEOC in July 2003 and a complaint with UCOP Human Resources AVP
25        Boyette in November 2003 in regards to the management and discrimination
          actions and or decisions that occurred during this period and the last
26        evaluation period.  I have worked for the University of California for 15 years;
          this department is the first to give me unfavorable evaluations.  My
27        employment record with the University should speak for itself.

28        On February 24, 2004, Howland sent plaintiff a letter regarding the interactive

United States District Court
For the Northern District of California

1   process, noting that the obligation was "mutual" in that plaintiff must provide information

2   that is reasonable and necessary for the University to determine what accommodation it

3   should give her.  He again requested medical documentation supporting her request for a

4   transfer – which plaintiff had yet to provide.  Howland stated that the University was

5   providing plaintiff with an effective accommodation, as described by Dr. Davis (1-2 days off

6   per month).  He wrote, "If you disagree, then please help us.  The University must have

7   clear medical information on a different accommodation that is necessary and effective to

8   enable you to perform the essential functions of your position.  If your doctors are unwilling

9   to provide this information, we cannot proceed further."

10       On March 11, 2004, plaintiff requested a "Step II" fact finder to review her PPSM

11   complaint.  In the letter, plaintiff stated that her complaint of violation of Policy 12

12   (discrimination) pertained not only to the May 23, 2002, Performance Evaluation, but also

13   to the January 28, 2003, Counseling Memo and the September 8, 2003, Letter of Warning,

14   and that her complaint was based on "the lack of a clear attendance policy."  She claimed

15   that she did not know what was required of her in order to alert her supervisor to her health

16   issues.  She stated that she had advised "him" (probably referring to Ireland) that she "was

17   not feeling very well" and that she had "sought medical attention."  She claimed that she

18   had not been able to obtain a personal physician at Kaiser until May 2002, and that prior to

19   that time no confirming diagnosis had been made.

20       She asserted that at the point at which she realized she was not able to do her job at

21   UC, she had exhausted the allotted number of psychiatric visits permitted at Kaiser.  In

22   addition, however, she was hoping to find another job, and did not want a "documented

23   psychiatric disability."  She claimed that she had been "forced" to disclose this information

24   because of adverse personnel actions that were taken against her.  She also asserted that

25   she was not familiar with the complaint resolution process, and claimed that she had not

26   been informed of the steps or actions that are taken in conducting an investigation.

27       At some point in March 2004, plaintiff asked Howland if she could move to a "less

28   noisy" area.  Howland states in his declaration that he suggested a different cubicle in an

1   area with less traffic, but plaintiff refused because she claimed the cubicle was too small

2   and too close to Hoffman's office.

3       On April 7, 2004, Howland received a "visit verification" from plaintiff's doctor, Dr.

4   Raymond Davis, which indicated that plaintiff needed to avoid "extreme psychological

5   stress."  The next day, Howland sent Dr. Davis a letter requesting clarification as to what he

6   meant by "extreme psychological stress."  In the letter, Howland stated that plaintiff was

7   already working reduced hours, at her request, but added that "[t]here has been no

8   guidance as required for reasonable accommodation, for any specific work restrictions that

9   the employer can evaluate to determine if reasonable accommodation is possible."  He

10  added that "[t]he University does not want to assume disability if none exists."  He

11  requested "a clear definition of any restrictions and/or preclusions."

12      On April 12, 2004, Dr. Davis responded to Howland, stating that the phrase "please

13  help patient avoid extreme psychological stress" was intended to facilitate communication

14  between plaintiff and "her workplace," and that it "should not preclude her ability to continue

15  to work in her usual job."  He added that if there were further questions, Howland should

16  ask plaintiff to sign a medical release.  Howland asserts, however, that he had previously

17  requested plaintiff's consent to contact Kaiser directly regarding her request for

18  accommodation, and had provided plaintiff with a copy of a Kaiser Permanente

19  authorization form, but that plaintiff had informed him she would not sign the authorization.

20      At some point in early April 2004, plaintiff allowed Howland to contact her treating

21  psychologist, Dr. Sheila Byrns (a private practitioner, not affiliated with Kaiser), to ascertain

22  whether Dr. Byrns thought plaintiff required any restrictions or limitations.  Dr. Byrns was

23  unable to provide any information, however, as she had just started working with plaintiff.

24  Howland then wrote Dr. Byrns a letter, on April 12, 2004, summarizing his phone

25  conversation with her, identifying the accommodations the Regents had provided to date,

26  and asking whether there were any additional restrictions or accommodations that Dr.

27  Byrns thought were necessary.

28      On April 16, 2004, Hoffman sent plaintiff a notice that the Regents intended to

1    terminate her employment.  According to Hoffman, despite the discussions she and Ireland

2    had had with plaintiff about her performance, plaintiff's insubordination and absenteeism

3    continued to present problems that negatively affected the department.  The letter stated

4    that the termination would be effective May 6, 2004, and that it was based on "your

5    continuing performance problems, including your failure to deposit checks in a timely

6    manner, insubordination, failure to follow instructions regarding reconciliation, not entering

7    orders into the financial system in a timely manner, delays with processing invoices, and

8    ongoing issues with filing."  The letter also stated that in accordance with PPSM Policy 64,

9    Section C, Notice and Decision, plaintiff had a right to respond, orally or in writing, within 8

10   days, to Associate VP Kristine Hafner.

11          Shortly after Hoffman sent plaintiff the April 16 letter, Howland received a letter from

12   Dr. Byrns requesting that he transfer plaintiff to another location as a reasonable

13   accommodation for her IBS and the accompanying stress.  Howland states that he believes

14   that this is the first and only written request from a medical provider concerning a transfer.

15   At the time, plaintiff was on an undocumented leave of absence.

16          Howland asserts that over the course of two years, either he or Caldwell had met

17   with plaintiff on approximately eight separate occasions to discuss her desire to move out

18   of the IR&C Department.  He states that on at least five of those occasions, they had asked

19   plaintiff to provide some medical certification supporting the request, but that she failed to

20   provide anything at all until after she had received the notice of termination.  Howland

21   claims that plaintiff insisted that the doctors' examination reports related to her workers'

22   compensation claim – the reports by Drs. Lucila, Cherry, and Waldman – were sufficient to

23   support the request for a transfer.  He says he told plaintiff that those reports were not

24   sufficient because they addressed the workers' comp claim only in general terms, and did

25   not show that a transfer to a different location would have been an effective or  reasonable

26   accommodation.  To the contrary, all the reports indicated that plaintiff could return to work

27   "with no restrictions."

28          Howland also states that at the time plaintiff requested to be moved, there was no

1    other position available within the IR&C Department for which she was qualified.  He adds

2    that he did not have the authority or the ability to bypass the normal application and

3    interview process, or to move an employee from UCOP to a different UC campus, because

4    there is no reciprocity between UCOP and other UC campuses.  He stated that he had

5    never moved a UCOP employee to another UC campus as an accommodation, because

6    there is no viable internal policy for such a move.

7         On May 5, 2004, Dr. Byrns released plaintiff to return to work "with accommodations

8    – i.e., not to be returned to a hostile work environment."  She provided no further guidance,

9    and at that point the University was already processing plaintiff's termination.

10         On May 7, 2004, Kristine Hafner issued plaintiff a formal notice of termination.  She

11   noted that plaintiff had sent an e-mail on April 22, 2004, regarding the April 16, 2004, letter,

12   and that she and plaintiff had also talked on the phone on April 23, 2004, during which time

13   Hafner offered to extend the time for plaintiff to respond to the April 16, 2004, letter.  Hafner

14   also noted that on April 29, 2004, she had received an additional e-mail from plaintiff in

15   which she acknowledged receipt of the April 26, 2004, letter.  Hafner stated, however, that

16   plaintiff had not provided any additional information responding to the specific reasons for

17   the termination (stated in the letter of intent), but rather wrote at length informing Hafner

18   that the University had failed to accommodate her appropriately.  She added that the

19   termination would become final, as plaintiff had provided no explanation or defense

20   regarding the reasons specified in the notice of intent to terminate.  She also advised

21   plaintiff that she had the right to file a formal grievance within 30 days in accordance with

22   PPSM 70 – Complaint Resolution.

23         Meanwhile, in response to plaintiff's request for a Step II fact finder, the University

24   had appointed Julia Armstrong to conduct the investigation.  Armstrong issued her 12-and-

25   a-half-page-report on June 1, 2004, and the University provided plaintiff with a copy.

26   Rosemary Monroe, UCOP's Chief HR Officer, advised plaintiff that she was in agreement

27   with Armstrong's conclusions, that plaintiff's complaint was denied, and that "[t]his decision

28   is final and binding in accordance with the University of California, Office of the President,

1   Human Resource Procedure 70 – Complaint Resolution."

2       Armstrong states that in the course of her investigation, she interviewed eight

3   individuals including plaintiff, Caldwell, Ireland, and Hoffman.  She also reviewed the

4   complete complaint file (including the documents referenced in the above narrative),

5   plaintiff's personnel files at UCOP and UCB, many e-mail messages to and from the

6   principal parties, plaintiff's monthly attendance reports, plaintiff's individual time reporting

7   slips, medical information submitted by plaintiff, letters denying plaintiff's workers'

8   compensation and disability claims, and PPSM 12, 43, and 81.

9       With regard to the alleged violation of PPSM 12 (discrimination), Armstrong found no

10  facts to support the allegation.  She stated that Ireland's evaluation of plaintiff's

11  performance from March 1, 2001, to February 29, 2002, was accurate, in that plaintiff's

12  unplanned absences for scheduled activities constituted an area of performance that

13  needed improvement.

14      Armstrong found plaintiff's demands for an "attendance policy" and a written list of

15  performance expectations – and her assertion of no responsibility for the failings in her

16  performance – to be disingenuous at best.  Armstrong noted that plaintiff understood what

17  was expected of her in her job well enough to have met or exceeded those expectations in

18  her first year in the position; and that as an experienced University employee who had

19  supervised staff, she should have been familiar with the University's practice of using the

20  job responsibilities contained in the position description as a foundation for assessing an

21  employee's performance, should have been aware of the University's policy of requesting

22  leave approval in advance for scheduled activities, and should have been aware of the

23  normal hours of the work day at the University.  She noted that even after plaintiff was

24  provided with copies of the University's leave policy and the IR&C operating guidelines, her

25  pattern of being absent for scheduled activities without prior approval continued.

26      Armstrong noted that Ireland had issued the May 23, 2002, performance evaluation

27  and the January 28, 2003, counseling memo before he had been notified that plaintiff had a

28  certified disability.  In addition, Ireland had excluded plaintiff's sick leave absences from his

United States District Court

For the Northern District of California

performance evaluation, and thus her health problems were not a consideration in his

assessment.  Armstrong added, however, that until Dr. Davis had provided the certification

dated May 20, 2003, that plaintiff suffered from IBS, plaintiff had conveyed no information

to the University regarding a disability or any job restrictions; and that after Dr. Davis

provided the certification, plaintiff's request for 1-2 days off per month was granted.

Armstrong found no evidence that the September 8, 2003, letter of warning was

issued in retaliation for plaintiff's having filed a complaint with DFEH.  She found the tone of

plaintiff's responses to Hoffman's e-mail messages immediately preceding the issuance of

the letter of warning to be combative and brusque – not what a supervisor should expect

from a subordinate.  She stated that plaintiff had not provided a copy of the recording she

allegedly made of the August 20, 2003, meeting with Hoffman, and that therefore the only

contemporaneous evidence of what transpired was Hoffman's e-mail to plaintiff.  Based on

that, Armstrong found that the description of plaintiff's behavior during the meeting, as well

as the documented problems with her performance, provided a non-discriminatory basis for

the letter of warning.

With regard to the alleged violation of PPSM 81 (failure to provide reasonable

accommodation), Armstrong found no facts to support the allegation.  She noted that

plaintiff first requested accommodation in the form of a transfer to a position on the UCB

campus or to a different office within UCOP on June 12, 2002.  However, at that time, she

presented no medical certification or recommendation in support of such accommodation.

The UCOP policy states that "[t]he employee is responsible for requesting accommodation

and for providing medical documentation to assist in understanding the nature of the

employee's functional limitations.  This documentation may be subject to confirmation by a

University-appointed licensed healthcare provider."

Armstrong noted that most of the Kaiser Permanente "visit verification" forms, which

plaintiff submitted to explain her medical absences from work, did not state that she had a

permanent disability that placed restrictions on her ability to perform the functions of her

job.  Armstrong found that all the temporary accommodations recommended by plaintiff's

United States District Court

For the Northern District of California

1   providers when she returned from leave in 2002 were granted, and that she had been

2   cleared for work without restriction once the periods of temporary accommodation came to

3   an end.

4        Armstrong noted further that Dr. Davis' May 20, 2003, certification of plaintiff's IBS

5   and his recommended permanent accommodation (1-2 days off per month) for her return to

6   work as of that date were the first notices received by IR&C that required reasonable

7   accommodation under PPSM 81.  That request was granted, as was plaintiff's later request

8   for a 10% reduction in time.  Armstrong found that plaintiff's absences from May 20, 2003,

9   until she filed her complaint on September 10, 2003, were far in excess of the

10  accommodation recommended by Dr. Davis.  She notes that the monthly attendance

11  reports for May 22 to September 10, 2003, record 217 hours of absence from work.

12       On June 1, 2004, Rosemary Monroe, UCOP's Chief Human Resources Officer,

13  provided plaintiff with a copy of Ms. Armstrong's report, and stated that she was in

14  agreement with Ms. Armstrong's conclusions.  Ms. Monroe wrote,

15
16       Based on her report as well as my review of the case, I find no violation of the
         University of California Policies and Procedures, 12, Nondiscrimination in
         Employment, or 81, Reasonable Accommodations, nor do I find evidence of
17       retaliation for complaints filed with the Department of Fair Employment and
         Housing (DFEH) and Equal Employment Opportunity Commission (EEOC).
18       Your complaint is, therefore, denied.  This decision is final and binding in
         accordance with University of California, Office of the President, Human
19       Resources Procedure 70 – Complaint Resolution.

20       On June 2, 2004, plaintiff filed a formal internal complaint regarding her termination.

21  According to UCOP Labor Relations Specialist Karen Yun ("Yun"), plaintiff failed to provide

22  further information to assist in the processing of the complaint when requested to do so.

23  After repeated attempts to obtain the required information from plaintiff, Yun closed the

24  June 2, 2004, complaint on August 17, 2004.

25       Plaintiff filed this action on September 13, 2004, in the Superior Court of California,

26  County of Alameda, against the Regents and Hoffman.  In the first amended complaint,

27  plaintiff alleges the following claims:  (a) disability discrimination, harassment, retaliation,

28  and failure to accommodate, in violation of the Americans With Disabilities Act (ADA), 42

United States District Court

For the Northern District of California

1   U.S.C. § 12101, et seq.; (b) disability discrimination, harassment, retaliation, failure to

2   accommodate, failure to engage in a good-faith interactive process, and failure to prevent

3   discrimination and harassment, in violation of the California Fair Employment and Housing

4   Act (FEHA), California Government Code § 12940; (c) discrimination, harassment, and

5   retaliation for taking time off under the Family Medical Leave Act (FMLA), 29 U.S.C.

6   § 2601, et seq., and the California Family Rights Act (CFRA), California Government Code

7   § 12945.2.[2]

8        At the hearing on defendants' motion, plaintiff's counsel advised the court that

9   plaintiff was withdrawing the ADA discrimination and harassment claims, as well as the

10  ADA claims of failure to accommodate and failure to engage in a good-faith interactive

11  process.  Thus, the only ADA claim remaining in the case is the retaliation claim.

12       Defendants now seek summary judgment on all claims.

13                                  **DISCUSSION**

14  A.   Legal Standard

15       Summary judgment is appropriate when there is no genuine issue as to material

16  facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

17   Material facts are those that might affect the outcome of the case.  Anderson v. Liberty

18  Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there

19  is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

20       A party seeking summary judgment bears the initial burden of informing the court of

21  the basis for its motion, and of identifying those portions of the pleadings and discovery

22  responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

23  v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

24  at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

25  ────────────────

26  [2]  The only cause of action alleged against "[d]efendants" as opposed to "[d]efendant

27  UC" is the fifth cause of action, which asserts that "[d]efendants harassed and retaliated against [p]laintiff because of her disability and/or because she took time off pursuant to Cal. Gov. Code § 12945.2, in violation of Gov. Code §§ 12945.2, 12940(h), and 12940(j)."  At the

28  hearing on defendants' motion, plaintiff's counsel clarified that the only claims asserted against Hoffman are the claims of harassment and retaliation.

**United States District Court**
For the Northern District of California

1    than for the moving party.  On an issue where the nonmoving party will bear the burden of

2    proof at trial, the moving party can prevail merely by pointing out to the district court that

3    there is an absence of evidence to support the nonmoving party's case.  Id.  If  the moving

4    party meets its initial burden, the opposing party must then set forth specific facts showing

5    that there is some genuine issue for trial in order to defeat the motion.  See    Fed. R. Civ.

6    P. 56(e); Anderson, 477 U.S. at 250.

7         "To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least

8    some significant probative evidence tending to support the complaint."  Smolen v. Deloitte,

9    Haskins & Sells, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted).  The court must

10   view the evidence in the light most favorable to the non-moving party.  United States v. City

11   of Tacoma, 332 F.3d 574, 578 (9th Cir. 2003).  The court must not weigh the evidence or

12   determine the truth of the matter, but only determine whether there is a genuine issue for

13   trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).  If the nonmoving party

14   fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment

15   as a matter of law."  Celotex, 477 U.S. at 323.  Regardless of whether plaintiff or defendant

16   is the moving party, each party must "establish the existence of the elements essential to

17   [its] case, and on which [it] will bear the burden of proof at trial."  Id. at 322.

18   B.    Defendants' Motion for Summary Judgment

19        Defendants argue that because plaintiff failed to seek judicial review of the

20   University's final decision, her claims are barred by the failure to exhaust judicial remedies.

21   Defendants also contend that summary judgment should be granted on the claim of

22   disability discrimination because plaintiff's termination had no connection with her alleged

23   disabilities, and because she cannot show that the University's articulated reason for the

24   termination was pretextual; that summary judgment should be granted on the harassment

25   claim because plaintiff cannot show that defendants subjected her to unwelcome

26   harassment; that summary judgment should be granted on the retaliation claims because

27   plaintiff cannot show a causal link between her protected activities and her termination, and

28   cannot show pretext; that summary judgment should be granted on the claim of failure to

24

United States District Court

For the Northern District of California

accommodate because the University accommodated plaintiff's only disability (IBS), because accommodation was not required for "stress/anxiety," and because a transfer away from a supervisor is not a reasonable accommodation; that summary judgment should be granted on the claim of failure to engage in a good-faith interactive process because there is no viable claim of failure to accommodate; and that summary judgment should be granted on the claim of CFRA/FMLA retaliation/interference because the evidence shows that the University granted all plaintiff's requests for CFRA/FMLA leave, and that her termination was based on performance problems, not on excessive absences.

1.     Exhaustion of Judicial Remedies

Defendants argue that plaintiff's claims are barred by her failure to successfully exhaust her judicial remedies by seeking judicial review (writ of mandate) of the Regents' final decision on her internal complaint of discrimination, failure to accommodate, and retaliation.  Under California law, a party who has received an adverse ruling in a "quasi-judicial" proceeding must first succeed in overturning the quasi-judicial action before pursuing her claim.  Westlake Community Hosp. v. Superior Court, 17 Cal. 3d 465, 484 (1976); see also Ishimatsu v. Regents of Univ. of Calif., 266 Cal. App. 2d 854, 862 (1968).

California courts have made clear that a public employee may initially choose between filing either an internal grievance or an FEHA administrative claim, but that employees who pursue an internal grievance to a final decision are not permitted "a second 'bite of the procedural apple'" by pursuing an action for damages as well.  Schifando v. City of Los Angeles, 31 Cal. 4th 1074, 1090-91 (2003).  In other words, while a public employee may choose to bypass the internal administrative process, she has the burden of exhausting judicial remedies if she chooses to pursue the internal process.  Page v. Los Angeles County Probation Dept., 123 Cal. App. 4th 1135, 1142-44 (2004).

When a public employee "pursues administrative civil service remedies, receives an adverse finding, and fails to have the finding set aside through judicial review procedures, the adverse finding is binding on discrimination claims under FEHA."  Johnson v. City of Loma Linda, 42 Cal. 4th 61, 76 (2000); see also Williams v. Housing Auth. of City of Los

1    <u>Angeles</u>, 121 Cal. App. 4th 708, 724-25 (2004) (when an employee pursues an internal

2    administrative remedy, the employee must timely seek judicial review from an adverse

3    administrative decision by seeking a writ of mandate <u>before</u> filing a civil action – a

4    procedure known as "exhaustion of judicial remedies").

5         Plaintiff opposes the motion, asserting that <u>Schifando</u> holds that an employee

6    alleging FEHA claims does <u>not</u> have to exhaust internal remedies.  In <u>Schifando</u>, the

7    California Supreme Court held that an employee of the City of Los Angeles was not

8    required to exhaust internal remedies before filing a FEHA claim – in other words, that the

9    exhaustion of internal remedies was not a prerequisite to the filing of the employee's FEHA

10   complaint.  However, contrary to plaintiff's assertion, <u>Schifando</u> also held that an employee

11   who has elected to pursue internal remedies and has obtained a "final decision" must

12   exhaust those remedies by judicially challenging the final decision before proceeding on a

13   FEHA claim.  <u>Schifando</u>, 31 Cal. 4th at 1090-91.

14        The court in <u>Schifando</u> affirmed its earlier opinion in <u>Johnson v. City of Loma Linda</u>,

15   where it ruled that because the plaintiff had exhausted the remedies offered by the City of

16   Loma Linda, but had not exhausted judicial remedies by seeking judicial review of the City's

17   final decision, the City's findings were binding on subsequent FEHA claims.  <u>Schifando</u>, 31

18   Cal. 4th at 1090.  The court explained that "refusing to give binding effect to those quasi-

19   judicial findings would 'undermine the efficacy of such proceedings, rendering them in

20   many cases little more than rehearsals for litigation.'"  <u>Id.</u> (quoting <u>Johnson</u>, 24 Cal. 4th at

21   72).

22        As the Ninth Circuit has explained, "California has made it quite clear that a

23   discharged civil servant who <u>elects</u> an administrative forum for review of his or her

24   termination must succeed in overturning that administrative decision through the judicial

25   mandamus review procedure <u>prior to</u> filing a suit for damages on claims arising out of the

26   termination."  <u>Miller v. County of Santa Cruz</u>, 39 F.3d 1030, 1038 (9th Cir. 1994).

27        Plaintiff's second argument is that the cases do not support defendant's argument

28   that the "Step II" fact-finding was "quasi-judicial."  However, California courts have regularly

United States District Court

For the Northern District of California

reaffirmed that the Regents' personnel proceedings are "quasi-judicial" in nature.  Based on the grant of power in article IX, section 9 of the California Constitution, "policies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of state statutes."  Bunnett v. Regents of Univ. of Calif., 35 Cal. App. 4th 843, 848 n.2 (1995). In Ishimatsu, "it was first held that the constitutional grant of power to the University of California includes the grant of quasi-judicial powers.  That decision has found general acceptance."  Bunnett, 35 Cal. App. 4th at 848 n.2 (citing Ishimatsu, 198 Cal. App. 3d at 864); see also Apte v. Regents of Univ. of Calif., 198 Cal. App. 3d 1084, 1090-91 (1988).

Plaintiff contends, however, that because the University did not hold a formal evidentiary hearing on her internal complaint, the administrative proceeding cannot be considered "quasi-judicial."  However, "quasi-judicial" proceedings are defined in California by the nature of the issues presented and decided, not whether a formal hearing is involved.  Bunnett, 35 Cal. App. 4th at 848.

> [J]udicial review via administrative mandate is available only if the decision resulted from a proceeding in which by law 1) a hearing is required to be given, 2) evidence is required to be taken, and 3) discretion in the determination of facts is vested in the agency.  [By contrast] ordinary mandate is used to review adjudicatory actions or decisions when the agency was not required to hold an evidentiary hearing.

Id. (citations and quotations omitted).  Here, the procedures were governed by UCOP's Human Resources Procedure 70, issued in connection with the Regents' Personnel Policies for Staff Members.  There is no provision in PPSM 70 for a formal evidentiary hearing as part of the Step II fact-finding.  PPSM requires that the fact-finder

> conduct an investigation as appropriate to determine the pertinent facts, which may include meeting with each party to the complaint individually and/or jointly.  The Fact-Finder shall then submit a written report to the Manager, UCOP Employee and Labor Relations (or designee) . . . . The fact-finding report shall contain the following information:
>
> – A clear statement of the issues under review;
>
> – The position of opposing parties;
>
> – A summary of the information received during the investigation;
>
> – Findings of fact; and

**United States District Court**
For the Northern District of California

1          – Conclusions, including policy violations, if any.

2   PPSM 70 does permit the employee to request a formal hearing at Step III, but only if the

3   employee has not requested a fact-finding review at Step II.  In this case, plaintiff opted to

4   request an "appeal" of the initial decision via Step II fact-finding, rather than seek an appeal

5   in a Step III hearing.

6          Plaintiff contends that under U.S. v. Utah Constr. & Min. Co., 384 U.S. 394 (1966), a

7   final decision in an administrative proceeding cannot have collateral estoppel effect unless

8   the procedure offered an "adequate opportunity to litigate."  In Miller, the Ninth Circuit held

9   that, whether based on claim preclusion or issue preclusion, "unreviewed findings of a state

10  administrative tribunal are entitled to preclusive effect" in a subsequent action in federal

11  court only if the fairness requirements of Utah Construction are met – that is, the

12  administrative agency must have acted in a judicial capacity, the agency must have

13  resolved disputed issues of fact properly before it, and the parties must have had an

14  adequate opportunity to litigate.  Miller, 39 F.3d at 1032-33 (citing Utah Constr., 384 U.S. at

15  422).  The threshold inquiry in such a case is whether the state administrative proceeding

16  was conducted with sufficient safeguards to be equated with a state court judgment.  Id. at

17  1033.

18         Here, plaintiff argues that "an investigation is not a hearing," and asserts that

19  because she did not have an adequate opportunity to litigate her claims in an evidentiary

20  hearing, the Utah Construction minimum fairness requirements were not met.  As noted

21  above, however, plaintiff chose to proceed through the Step II fact-finding process, without

22  a hearing, rather than through the Step III appeal process, with a hearing.  Moreover, while

23  the Step II fact-finding process did not involve a hearing, it was conducted by a neutral fact-

24  finder who gathered evidence, reviewed all the records, interviewed witnesses (including

25  plaintiff), and issued a report summarizing all the evidence and making findings based on

26  that evidence.  Having received a final determination of no discrimination, no failure to

27  accommodate, and no retaliation for filing the DFEH/EEOC charge, and having failed to

28  have that decision set aside through judicial review procedures, plaintiff is now barred from

28

United States District Court

For the Northern District of California

1   attempting to assert the claims that were raised in the internal complaint.  See Risam v.

2   County of Los Angeles, 99 Cal. App. 4th 412, 419-22 (2002).

3        The court finds that the motion must be GRANTED as to the FEHA claims for

4   disability discrimination, retaliation for having filed the administrative charge with DFEH,

5   failure to accommodate, and failure to engage in a good-faith interactive process.  All these

6   claims were raised in plaintiff's September 10, 2003, formal internal complaint, and in her

7   March 11, 2004, request for a "Step II" fact finder.  Ms. Armstrong, the fact-finder, found no

8   evidence to support any of these claims, and plaintiff did not seek judicial review of the

9   University's final decision.

10       It appears that defendants are asserting that all "claims" – under both federal and

11  state law – are barred because plaintiff did not exhaust judicial remedies.  The court's

12  interpretation, however, is that only the state-law claims that were raised in the internal

13  complaint are barred under this theory.  Plaintiff did not raise the FEHA harassment claim

14  or the FEHA claim of retaliation for having taken medical leave in the internal complaint.  To

15  the extent that the harassment claim can be viewed as distinct from the discrimination or

16  retaliation claims, that claim is not barred.  The FEHA (CFRA) retaliation claim is essentially

17  the same as the FMLA retaliation claim, and will be considered in that section.

18       Moreover, in Johnson, the California Supreme Court held that Title VII claims are not

19  precluded by state administrative decisions that have not been judicially reviewed on their

20  merits because the EEOC is only required to give "substantial weight" to such findings.

21  The Johnson court cited University of Tennessee v. Elliott for the proposition that

22  "Congress did not intend unreviewed state administrative proceedings to have preclusive

23  effect on Title VII claims."  Johnson, 24 Cal. 4th at 75 (citing University of Tennessee v.

24  Elliott, 478 U.S. 788, 795 (1986)).  Based on this reasoning, and the fact that the law

25  applicable to Title VII claims is generally applicable to claims under the ADA, the court finds

26  that the ADA retaliation claim is not barred by plaintiff's failure to exhaust judicial remedies.

27       2.   Disability discrimination claim

28       As an alternative basis for granting summary judgment on the FEHA disability

29

United States District Court

For the Northern District of California

1   discrimination claim, the court finds that plaintiff has provided no evidence that raises a

2   triable issue with regard to whether the Regents' stated reasons for terminating her were

3   pretextual.

4          Because of the similarity between state and federal employment discrimination laws,

5   California courts look to pertinent federal precedent when applying California statutes.  Guz

6   v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354 (2000).  In a disparate treatment case, the

7   plaintiff must show that intentional discrimination was the determinative factor in the

8   adverse employment action.  Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993).

9   There are two ways of proving intentional discrimination – direct evidence, and indirect or

10  circumstantial evidence.  Guz, 24 Cal. 4th at 354.

11         Direct evidence is evidence that proves the fact of discriminatory animus without

12  inference or presumption.  Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir.

13  1998).  In most cases, such as the present one, there is no direct evidence of

14  discrimination by the employer, and discrimination claims must be proved indirectly

15  (circumstantially).  Guz, 24 Cal. 4th at 354.  In such cases, discrimination claims are

16  analyzed under an allocation of burdens of production and proof, based on the model set

17  forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).

18         Under the McDonnell-Douglas framework, the burden of production first falls on the

19  plaintiff to make out a prima facie case of discrimination.  The specific elements of a prima

20  facie case may vary depending on the facts.  Guz, 24 Cal. 4th at 355 (citing Texas Dep't of

21  Community Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  Generally, the plaintiff must

22  provide evidence showing that she was a member of a protected class, that she was

23  qualified for the position sought or was performing competently in the position she held,

24  that she suffered an adverse employment action, such as termination or demotion or denial

25  of an available job, and that some other circumstance suggests discriminatory motive.  Id.;

26  see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); McGinest v. GTE

27  Serv. Corp., 360 F.3d 1103, 1122 (9th Cir. 2004).

28         If the plaintiff establishes a prima facie case, a presumption of discrimination arises.

30

United States District Court

For the Northern District of California

1    Guz, 24 Cal. 4th at 355 (citing St. Mary's Honor Center, 509 U.S. at 506).  The burden of

2    production then shifts to the employer, who must present evidence sufficient to permit the

3    factfinder to conclude that the employer had a legitimate, nondiscriminatory reason for the

4    adverse employment action.  Id. at 355-56.  If the employer sustains this burden, the

5    presumption of discrimination disappears, and the plaintiff must demonstrate that the

6    employer's articulated reason is a pretext for unlawful discrimination, either directly by

7    persuading the court that a discriminatory reason more likely motivated the employer or

8    indirectly by showing that the employer's proffered reason is unworthy of credence.

9    Burdine, 450 U.S. at 256; see also Aragon v. Republic Silver State Disposal, Inc., 292 F.3d

10   654, 658-59 (2002) (en banc).

11         The ultimate burden of persuasion on the issue of actual discrimination remains with

12   the plaintiff.  Guz, 24 Cal. 4th at 356 (citing St. Mary's Honor Center, 509 U.S. at 518).  "If

13   the employer presents admissible evidence either that one or more of plaintiff's prima facie

14   elements is lacking, or that the adverse employment action was based on legitimate,

15   nondiscriminatory factors, the employer will be entitled to summary judgment unless the

16   plaintiff produces admissible evidence which raises a triable issue of fact material to the

17   defendant's showing."  Caldwell v. Paramount Unified School Dist, 41 Cal. App. 4th 189,

18   203 (1995) (citing Burdine, 450 U.S. at 255, n.8).

19         To establish a prima facie case of disability discrimination under FEHA, a plaintiff

20   must show that she suffered from a disability, that she was otherwise qualified to do the

21   job, and that she was subjected to adverse employment action because of her disability.

22   Diaz v. Fed. Express, 373 F. Supp. 2d 1034, 1063 (C.D. Cal. 2005); see also Snead v.

23   Metropolitan Prop. & Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001).

24         Here, defendants do not dispute that plaintiff may be disabled, although they do

25   argue that only the IBS qualifies as a "disability."[3]  Nevertheless, they contend that plaintiff

26

27         [3]  Defendants contend that stress and anxiety that are triggered by a conflict with a
28   supervisor cannot establish a "disability" if the employee can still do the same job under a
     different supervisor.

United States District Court

For the Northern District of California

1   cannot establish a prima facie case of disability discrimination because she cannot show

2   that her termination had any causal connection to her alleged disability.

3        Defendants also argue that they have provided a legitimate nondiscriminatory

4   reason for plaintiff's termination – that she had substantial performance issues and

5   attendance problems, which were well-documented, and which preceded her alleged

6   disability.  Defendants contend that the evidence shows that plaintiff's performance at work

7   – when she was there – was not up to standards, and that Hoffman and Ireland had tried to

8   work with her to ensure that she performed her job satisfactorily and cut down on the

9   number of non-medical absences.  Defendants argue that the evidence shows that plaintiff

10  was terminated because of her insubordination and continued performance problems,

11  reasons that had nothing to do with her alleged disability.

12       During the period March 2001 through February 2001, plaintiff was reported as

13  being absent 261.5 hours, of which 52.5 hours were entered as personal sick leave, 43.25

14  hours were recorded as family sick leave, 20 hours were leave without pay, and 145.75

15  hours were entered as vacation.  Moreover, it appears from the copies of leave requests

16  attached to plaintiff's declaration that plaintiff submitted the requests for approval of many

17  of the absences on the same day, or after the fact.  Hoffman claims that plaintiff missed

18  nearly 30 work hours during the department's busiest time of the year because her mother,

19  who provided childcare for plaintiff's youngest child, had to go out of town.  Defendants

20  assert that the absences for non-medical reasons far exceeded the number that were

21  medically certified for any disability, and note that plaintiff has admitted that many of the

22  absences were for scheduled events unrelated to her alleged disability.

23       In opposition, plaintiff argues, first, that her "anxiety disorder" is a disability under

24  FEHA if it makes the achievement of a major life activity "difficult."  With regard to the IBS,

25  plaintiff contends that defendants "knew of the IBS long before it was diagnosed" because

26  prior to the actual diagnosis, plaintiff "was complaining of illness, was missing work

27

28

32

United States District Court

For the Northern District of California

1   because of illness, and was seeking a transfer because of illness."[4]

2       With regard to the question whether her disability was a motivating factor in her

3   termination, plaintiff responds that she can prove that it was.  She notes that Ireland was

4   concerned about her absences and deteriorating performance.  She argues that the

5   "unscheduled and unplanned" absences that Ireland refers to in his declaration were

6   necessitated by IBS flareups, which did not occur according to a schedule.  However, she

7   provides no evidence to support this claim.

8       She also argues that while Hoffman stated that she was terminated because of

9   performance problems and absenteeism, she had informed Hoffman about the problems

10  resulting from her disability.  For example, she notes that she stated in the May 29, 2002,

11  letter following the May 23, 2002, performance evaluation that just being around people in

12  the department caused her stress.  She also claims that she made similar statements in the

13  September 10, 2003, meeting at which she was given the September 8, 2003, letter of

14  warning.  Plaintiff makes no attempt to argue that defendants' articulated reason for

15  terminating her was pretextual.

16      The court agrees that plaintiff has not provided any evidence showing that she

17  suffered an adverse action because of her alleged disability.  The adverse action that

18  plaintiff references in her August 2003 administrative charge is the May 23, 2002,

19  "performance evaluation."  However, the May 2002 performance evaluation cannot have

20  been prompted by a discriminatory animus based on disability because there is no

21  evidence that defendants were aware that plaintiff suffered from IBS prior to the certification

22  from Dr. Davis in May 2003.  The fact that plaintiff had been complaining that she was "ill"

23  was not sufficient to put defendants on notice that she was "disabled," as the definition of

24  "disability" is much narrower and more specific than the definition of "illness."

25      However, plaintiff does not discuss the May 2002 performance evaluation as an

26  adverse action in the context of a prima facie case of disability discrimination.  The only

27  _____

28      [4] Plaintiff does not explain how it could be possible for someone to know of a diagnosis before the diagnosis has been made.

**United States District Court**

For the Northern District of California

1    adverse action plaintiff discusses in her opposition to the motion is the termination.  She

2    provides no evidence showing that there was any connection between the termination and

3    the disability.

4         Given, however, that a plaintiff is required to make only a minimal showing of the

5    prima facie case, see Sischo-Nownejad v. Merced Cmty. College Dist., 934 F.2d 1104,

6    1110-11 (9th Cir. 1991), the court does not grant summary judgment on the basis that

7    plaintiff has failed to establish a prima facie case.  Rather, the court finds that summary

8    judgment should be GRANTED on the basis that plaintiff has not provided any evidence to

9    defeat defendants' showing that they had a legitimate, nondiscriminatory reason for

10   terminating her.

11        A plaintiff may not defeat a defendant's motion for summary judgment merely by

12   denying the credibility of the defendant's proffered reason for the challenged employment

13   action.  See Wallis v. J.R. Simplot Co., 26 F.3d 885, 890 (9th Cir. 1994).  Nor may a plaintiff

14   create a genuine issue of material fact by relying solely on the plaintiff's subjective belief

15   that the challenged employment action was unnecessary or unwarranted.  Cornwell v.

16   Electra Central Credit Union, 439 F.3d 1018, 1029 n.6 (9th Cir. 2006) (citing Bradley v.

17   Harcourt, Brace & Co., 104 F.3d 267, 270 (9th Cir.1996) (concluding, despite the plaintiff's

18   claims that she had performed her job well, that "an employee's subjective personal

19   judgments of her competence alone do not raise a genuine issue of material fact")).

20        In order to counter evidence that the defendant's employment decision was

21   nondiscriminatory, the plaintiff must produce "specific, substantial evidence of pretext."

22   Wallis, 26 F.3d at 890; see also Stegall v. Citadel Broadcasting Co., 350 F.3d 1061, 1066

23   (9th Cir. 2004).  Here, it is undisputed that plaintiff exhibited significant performance

24   problems, and plaintiff does not counter defendants' showing that she behaved in an

25   insubordinate and disrespectful manner.  She does not even address the issue, despite the

26   fact that defendants argue in their moving papers that she cannot show pretext.

27        3.    Harassment

28        A prima facie case for discrimination or harassment on grounds of disability under

34

**United States District Court**

For the Northern District of California

1    FEHA requires plaintiff to show that she suffers from a disability; that she is otherwise

2    qualified to do her job; and that she was subjected to adverse employment action because

3    of her disability.  Deschene v. Pinole Point Steel Co., 76 Cal. App. 4th 33, 44 (1999).

4         Defendants argue that plaintiff cannot raise an issue of fact that defendants

5    subjected her to unwelcome harassment.  They assert that other than Hoffman's legitimate

6    criticism of plaintiff's work performance, plaintiff cannot point to a single example of

7    Hoffman or anyone harassing her, and that there is no evidence of harassment based on

8    her disability.  They note that there is no evidence that anyone made any offensive

9    comment to plaintiff or insulted her, based on her disability.

10        In opposition, plaintiff argues that she "complained of constant, continuous

11   harassment."  In support, she cites to her response to defendants' Interrogatory No. 4,

12   where she stated,

13        Hoffman started chastising Plaintiff for things that were happening.  She
          talked down to Plaintiff.  She treated Plaintiff like she was an idiot.  She
14        repeatedly tried to tell Plaintiff what Plaintiff was supposed to be doing.
          Plaintiff knew what she was supposed to be doing.  Plaintiff had been doing it
15        for the previous year without incident.  All of a sudden, Hoffman felt the need
          to tell Plaintiff every little thing and kept repeating it over and over.  There was
16        always a constant reminder of something that Plaintiff did not do or something
          that needed to be done.  Plaintiff informed Hoffman, "If you guys would quit
17        bothering me, I can get some things done."  Hoffman was not Plaintiff's direct
          supervisor.  Hoffman refused to go through Ireland to give Plaintiff direction.
18        If was evident that Hoffman felt the need to do it herself.

19        The court finds that summary judgment must be GRANTED on the harassment

20   claim.  Plaintiff's interrogatory response constitutes the entirety of the "evidence" that

21   plaintiff offers in support of her claim that she was harassed on account of her disability.

22   However, plaintiff has provided no evidence of any specific incident of harassment, or of

23   any harassing comment made to her or made in her presence – let alone any evidence of

24   harassment that was severe or pervasive.  Her sole complaint is that Hoffman "harassed"

25   her by telling her how to do her job, and by "chastising" her.  She asserts that Hoffman told

26   plaintiff "every little thing," and "kept repeating it over and over," and that Hoffman talked

27   down" to her, and treated her "like she was an idiot."  She also complains that Hoffman,

28   who was not her direct supervisor, improperly "refused to go through Ireland" to give her

United States District Court

For the Northern District of California

1  direction.

2      These comments and actions cannot support a claim of disability discrimination

3  claim because they are unrelated to plaintiff's asserted disability.  An employee alleging

4  disability harassment, just as disability discrimination, must ultimately prove that the

5  adverse employment action taken was based on the disability.  See Hersant v. Dep't of

6  Soc. Servs., 57 Cal. App. 4th 997, 1002 (1997).  In other words, plaintiff must prove that

7  defendants subjected her to harassment because of her disability – not, as she asserts

8  here, that the alleged harassment was itself the trigger or cause of the disability.

9      Moreover, in order to prevail on a claim of harassment, the plaintiff must show that

10  the alleged harassment was "sufficiently severe or pervasive" to alter the conditions of her

11  employment and create an abusive working environment.  Fisher v. San Pedro Peninsula

12  Hosp., 214 Cal. App. 3d 590, 609 (1989).  "In determining what constitutes 'sufficiently

13  pervasive' harassment, the courts have held that acts of harassment cannot be occasional,

14  isolated, sporadic, or trivial, rather the plaintiff must show a concerted pattern of

15  harassment of a repeated, routine or a generalized nature."  Id. at 610.

16      In showing that the conduct was sufficiently severe or pervasive, plaintiff must prove

17  both that she subjectively felt the conduct was abusive and that a reasonable person would

18  find the conduct hostile or abusive.   Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).

19  The objective reasonable person standard is measured by what a reasonable person with

20  the same fundamental characteristics would have considered abusive.  Factors a court may

21  consider include "the frequency of the discriminatory conduct; its severity; whether it is

22  physically threatening or humiliating, or a mere offensive utterance; and whether it

23  unreasonably interferes with an employee's work performance."  Id. at 23.

24      Plaintiff has not alleged conduct which is sufficiently severe and pervasive so as to

25  render her work environment objectively hostile.  According to plaintiff, Hoffman harassed

26  her by yelling, criticizing her work, and telling her how to do her job.  With regard to the

27  claim that Hoffman's "yelling" constituted harassment, "[i]t is a simple fact that in a

28  workplace, some workers will not get along with one another, and this Court will not elevate

a few harsh words . . . to the level of an actionable offense." <u>McConathy v. Dr. Pepper/ Seven Up. Corp.</u>, 131 F.3d 558, 564 (5th Cir. 1998).  Neither this court nor any court can force the University to require all of its employees to get along with every other employee. To do so would be to interpret the ADA as a "general civility code," which the Supreme Court specifically denounced (with regard to sexual harassment claims under Title VII) in <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998), and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).  Plaintiff provides no evidence that any of the "yelling" was physically threatening or humiliating.  Occasional hurtful remarks by a coworker or supervisor do not reach the appropriate level of severity.  <u>See</u> <u>Harris</u>, 510 U.S. at 23 (frequency of conduct may determine severity).

There is no evidence that the poor performance evaluations constitute harassment, as there is no evidence that Hoffman and Ireland had any knowledge of plaintiff's limitations when the evaluations were written.  As for Hoffman telling plaintiff how to do her work, the job of a supervisor is to supervise her subordinates' work, which includes telling them what to do.  The fact that Hoffman was not plaintiff's direct supervisor is irrelevant.  Plaintiff worked under both Ireland and Hoffman, and had no right to demand that only Ireland give her direction, or that no supervisor tell her how to do her job.  In view of plaintiff's apparent low tolerance for stress, the court cannot say that plaintiff did not subjectively view this conduct as "harassment."  Nevertheless, no objective observer would find this environment objectively abusive.

4.      Failure to Prevent Discrimination and Harassment from Occurring

FEHA makes it an unlawful employment practice for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k).  Courts have interpreted this provision as creating a tort sounding in negligence with the usual elements of breach of duty, causation and damages. <u>Trujillo v. North County Transit Dist.</u>, 63 Cal. App. 4th 280, 286-87 (1998).  The cause of action does not stand alone, but depends on the plaintiff being able to prove he or she was actually the victim of discrimination.  <u>Id.</u>  Because the court finds that summary judgment

United States District Court

For the Northern District of California

1   must be granted on the discrimination and harassment claims, the court also finds that

2   summary judgment must be GRANTED on the claim of failure to prevent discrimination and

3   harassment.

4        5.      Failure to Accommodate and Failure to Engage in Good-Faith

5                 Interactive Process

6        As an alternative basis for granting summary judgment on the claims of failure to

7   accommodate and failure to engage in a good-faith interactive process, the court finds no

8   triable issue with regard to the University's accommodation of plaintiff's alleged disability,

9   and finds further that the evidence shows that the University did attempt to engage in the

10  interactive process with regard to plaintiff's asserted need for accommodation.

11       Under California Government Code § 12940(m), it is "an unlawful employment

12  practice for an employer . . . to fail to make reasonable accommodation for the known

13  physical or mental disability of an applicant or employee."  Defendants contend that the

14  claim of failure to accommodate fails because the evidence shows that defendants

15  accommodated plaintiff's IBS, which they claim was her only disability.  They assert that the

16  only legitimate medical accommodation that plaintiff ever requested and supported with

17  medical certification was the request for 1-2 days off per month, which request was

18  granted.  Defendants also note that Dr. Davis, the doctor who recommended the

19  accommodation, testified in his deposition that there was no medical reason that plaintiff

20  needed to take more than 1-2 days off per month to cope with her IBS.

21       Defendants contend that the only requested accommodation that plaintiff claims the

22  Regents denied her was the transfer away from Hoffman.  They argue, however, that this

23  requested accommodation was neither reasonable nor feasible under the circumstances,

24  and would have imposed a hardship on the UCOP.  First, defendants contend that a

25  "transfer" away from a supervisor is not a reasonable accommodation under FEHA.  They

26  assert that a transfer or a reassignment to a vacant position can be considered as an

27  accommodation only if the disabled employee can no longer perform the requirements of

28  his or her current position even with some other accommodation.  They note that plaintiff's

United States District Court

For the Northern District of California

1    own doctor (Dr. Davis) testified in his deposition that plaintiff's medical condition (IBS) did

2    not impair her ability to perform her essential job functions, that she did not need to be

3    transferred away from her co-workers, and that she did not need to move to a new position.

4        In addition, defendants argue that plaintiff's requested accommodation was not

5    reasonable, as she needed to sit near the other employees in the unit in order to do her job

6    effectively.  The files, the invoices, and the computer system were all located on the same

7    floor, near Hoffman's office.  Hoffman testified in her deposition that much of the accounting

8    department's work is accomplished through communication within the department, and that

9    plaintiff worked closely with a financial analyst who needed to communicate with her face-

10   to-face.  In addition, defendants assert, plaintiff had demonstrated that she required

11   substantial supervision.  Defendants also contend that the evidence shows that there were

12   no other positions available at the time within the IR&C department for which plaintiff was

13   qualified.  Hoffman testified that she investigated whether there were any openings, but

14   found that there were not, and Howland confirmed that there were no openings.

15       Defendants argue that because Hoffman was the manager of the entire

16   administrative services department of UCOP, it would not have solved the problem to move

17   plaintiff to some other unit within the department.  Plaintiff would still have had contact with

18   Hoffman.  As for the question of a transfer to some other UCOP department, or some other

19   UC campus, that would require plaintiff to go through the application and interview process

20   – it was not something that defendants could do as a "reasonable accommodation."

21       Defendants assert, moreover, that they were not required to transfer plaintiff,

22   because her stress and anxiety resulted from a work conflict and are not disabilities.  They

23   argue that where an employee can perform all the duties of her position, but simply finds

24   herself incapable of working under a particular supervisor because of a personality conflict

25   that produces anxiety and stress, that employee is not disabled, because she is not limited

26   from the major life activity of working.  They argue that if stress and anxiety caused by a

27   personality conflict at work were sufficient to constitute a disability, every employee who

28   had (or created) a conflict with a supervisor could simply decide when he/she wanted a

United States District Court

For the Northern District of California

1   new supervisor as a means of "reasonable accommodation."

2          In opposition, plaintiff argues that it is undisputed that defendants failed to transfer

3   her to a location away from Hoffman, as plaintiff had requested.  She argues that the FMLA

4   leave and the shorter work week (accommodations given her for the IBS), were not

5   "effective" reasonable accommodations because they did not remove her from the source

6   of the problem (the contacts with Hoffman).  Plaintiff asserts that she could not transfer to

7   another UC department or campus while she was having performance issues, and claims

8   that the performance issues were caused by defendants' refusal to grant her requested

9   accommodation (the move away from Hoffman).  She complains that defendants refused to

10  "explore" accommodation unless she provided them with a medical certification, and

11  asserts that the insistence on a medical certification was "unlawful" (although she does not

12  explain why).

13         The court finds that the claim of failure to accommodate fails as a matter of law

14  because the Regents accommodated plaintiff's disability.  An employer is not required to

15  provide the exact accommodation that an employee requests, as the right to a reasonable

16  accommodation does not entitle a disabled employee to the best accommodation or even

17  to the accommodation of her choosing.  Hanson v. Lucky Stores, Inc., 74 Cal. App. 4th 215,

18  228 (1999).  Instead, "the employer providing the accommodation has the ultimate

19  discretion to choose between effective accommodations, and may choose the less

20  expensive accommodation or the accommodation that is easier for it to provide . . . . An

21  employee cannot make his employer provide a specific accommodation if another

22  reasonable accommodation is instead provided."  Id.

23         Here, the evidence shows that the Regents attempted to address plaintiff's requests

24  for accommodation by granting all plaintiff's FMLA leave requests; approving a reduction in

25  her work hours; lightening her work load by transferring some of her accounts to other

26  employees and covering her desk and computer in her absence to assure she was not

27  overwhelmed upon her return; providing her with a different immediate supervisor after

28  Ireland left UCOP; offering to move her to a "less noisy" cubicle; and granting her request

United States District Court

For the Northern District of California

1    to take 1-2 days off per month as needed.  In light of defendants' showing of the efforts the

2    University made to accommodate plaintiff, the fact that the University was unable to

3    transfer her away from her supervisor is insufficient to create a triable issue with regard to

4    the claim of failure to accommodate.

5        Defendants also argue that plaintiff's claim of failure to engage in a good-faith

6    interactive process fails because where there is no reasonable accommodation, failure to

7    engage in an interactive process is of no consequence.

8        Under FEHA, it is an unlawful employment practice for "an employer to fail to

9    engage in a timely, good faith, interactive process with the employee or applicant to

10   determine effective reasonable accommodations, if any, in response to a request for

11   reasonable accommodation by an employee or applicant with a known physical or mental

12   disability or known medical condition." Cal. Gov't Code § 12940(n); see Velente-Hook v.

13   Eastern Plumas Health Care, 368 F.Supp. 2d 1084, 1097 (E.D. Cal. 2005).

14       The standard for FEHA violations for failure to engage in the interactive process

15   tracks the standard for the ADA violations. Id. "The interactive process is a mandatory

16   rather than a permissive obligation on the part of employers under the ADA." Jensen v.

17   Wells Fargo Bank, 85 Cal. App. 4th 245, 261 (2000). This obligation is "triggered by an

18   employee . . . giving notice of the employee's disability and the desire for accommodation."

19   Id. The process requires good faith communication by both parties as a means of

20   achieving the shared goal of identifying an accommodation that would enable the employee

21   to perform his job effectively. Id.

22       Here, defendants assert that plaintiff refused to provide any medical support for her

23   requests that she be transferred, despite defendants' repeated attempts to communicate

24   with plaintiff on this issue. Defendants contend that the evidence shows that Caldwell

25   and/or Howland met with plaintiff on at least eight separate occasions over two years to

26   discuss her desire to move out of the IR&C department. They repeatedly asked her to

27   provide a medical certification supporting the request for transfer, which she failed to

28   provide until after she had received the notice of termination. Of the 21 Kaiser "Visit

United States District Court

For the Northern District of California

1  Verification" forms submitted by plaintiff in 2001, 2002, and 2003, none provided

2  information other than that she had been seen on a specific date for a "Serious Health

3  Condition" requiring absence and treatment; had been ill and unable to work for a specified

4  period of time, often one day; and could return to work on a specific date.  Only two of the

5  forms noted any restrictions on plaintiff's return to work, measured in days, indicating that

6  she should participate in modified work schedules for short periods of time, measured in

7  days, which the University approved.  The other 19 forms either indicated that she could

8  return to work or were silent concerning restrictions.

9       In opposition, plaintiff argues that defendants' attempt to "formalize the interactive

10  process" should be rejected.  She claims that rather than asking one of the workers' comp

11  doctors if a transfer would be effective, or writing a letter asking whether a transfer or

12  removal to another floor would be an effective accommodation, Howland simply

13  "formalized" the process by demanding that plaintiff provide a medical certification.  She

14  claims that Howland's refusal to implement an accommodation suggested by plaintiff until

15  he had received a medical certificate was unreasonable.

16       Plaintiff contends that she tried to obtain a medical certificate but was unable to do

17  so until she secured the letter from Dr. Byrns in April 2004, shortly before she received the

18  notice from Hoffman indicating that the Regents intended to terminate her employment.

19  Plaintiff argues that there are no cases holding that an employer can refuse reasonable

20  accommodation once termination proceedings have been started.  She claims that her

21  efforts to comply with Howland's requests were extensive, but asserts that she "never knew

22  what he wanted."  In her deposition, she testified that she had "maybe about approximately

23  three" meetings with Howland, and exchanged some e-mails and received some letters

24  from him.  They also talked on the phone.  She also testified that she met "maybe

25  approximately eight" times with Caldwell and Ireland.

26       Plaintiff admitted that University officials repeatedly asked her to give them access to

27  her medical records, and that she refused to allow access to her records from Kaiser.  She

28  told Howland that he could "speak freely with Dr. Byrns so they can work out my

United States District Court

For the Northern District of California

1  accommodations, but he was not getting access to my medical records."  She also testified

2  that she had given the University the medical evaluations she received in connection with

3  her workers' compensation claim, and asserted that those evaluations addressed the

4  causes of her disability and the need for future medical treatment.  She characterized the

5  medical evaluations as "independent medical examinations," not "just workers' comp

6  report[s]."

7          The court finds that summary judgment must be GRANTED on the claims of failure

8  to accommodate and failure to engage in a good-faith interactive process.  The only

9  disability that plaintiff has arguably established, based on medical diagnosis by a treating

10 physician, is the IBS.  The evidence shows that the first indication the University had that

11 plaintiff suffered from IBS was on May 20, 2003, when plaintiff informed Ireland of the

12 diagnosis for the first time.  However, she did not provide any medical certification showing

13 the need for extensive time off or for any particular accommodation.  The only certification

14 she provided was the statement from Dr. Davis, indicating that she "may require" one or

15 two days of medical leave per month.  Dr. Davis listed no other restrictions.  Ireland

16 approved this request.

17         Indeed, plaintiff admitted in her deposition that the University granted all her

18 requests for accommodation, with the exception of the request for a transfer.  Plaintiff

19 provided no indication that the transfer was medically justified, and she has not made any

20 showing to create a triable issue with regard to whether a transfer would have been

21 feasible, given defendants' evidence that there were no vacancies for plaintiff to transfer to.

22 Moreover, even if such a vacancy had existed, Hoffman was the manager of the entire

23 department.  Moving plaintiff to another position within the department would not have

24 minimized contact with Hoffman.

25         The evidence shows that the University also made multiple attempts to engage

26 plaintiff in the interactive process.  Plaintiff acknowledged in her deposition that she had

27 numerous meetings with Caldwell, Ireland, and Howland, and that she was asked

28 repeatedly to provide medical documentation to support her claim of disability and requests

1   for accommodations, but failed to do so.  In addition, the University contacted plaintiff's

2   treating physician, Dr. Davis, and requested additional clarification of his diagnosis.  Dr.

3   Davis informed the University that plaintiff was not "preclude[d] from her ability to continue

4   to work in her usual job," and suggested that the University ask plaintiff to sign a release for

5   her medical information.  Plaintiff, however, refused to complete the consent form.

6       Moreover, the evidence shows that the University granted all plaintiff's requests for

7   medical leave, reduced her work hours, reassigned some of her work responsibilities, and

8   offered to move her to a "less noisy" cubicle.  The sole request that the University was

9   unable to grant was plaintiff's request for a "transfer" out of the IR&C department, as

10  explained above.  Such a transfer was not only an unreasonable accommodation, it was

11  also not feasible, as Howland explains in his declaration.

12      6.    Retaliation

13      Plaintiff alleges she was terminated in retaliation for filing DFEH and EEOC

14  complaints and for requesting a reasonable accommodation, and for taking CFRA/FMLA

15  leave.

16          a.    ADA and FEHA

17      The ADA provides: "No person shall discriminate against any individual because

18  such individual has opposed any act or practice made unlawful by this chapter or because

19  such individual made a charge, testified, assisted, or participated in any manner in an

20  investigation, proceeding, or hearing under [the ADA]."  42 U.S.C. § 12203(a).  Similarly,

21  FEHA provides that it is unlawful for an employer to "discharge . . . any person because the

22  person has opposed any practices forbidden under [FEHA]."  Cal. Gov't Code § 12940(h).

23      In order to establish a prima facie case of retaliation, plaintiff must show 1) that she

24  engaged in a protected activity; 2) that she was thereafter subjected to an adverse

25  employment action; and 3) that a causal connection exists between the two.  Trent v. Valley

26  Elec. Ass'n, 41 F.3d 524, 526 (9th Cir. 1994).

27      Defendants argue that plaintiff cannot establish a prima facie case of retaliation

28  because there is no causal link between her "protected activities" and her termination.

44

United States District Court

For the Northern District of California

1   They note that she was reprimanded for poor attendance and performance before she ever

2   complained of having a disability, and that it was only after she received the May 2002

3   performance evaluation that she started complaining about unspecified health conditions.

4   Likewise, it was not until nine months after she filed the DFEH charge that she was

5   terminated.

6        Defendants also contend that plaintiff's retaliation claims fail because she cannot

7   show specific, substantial evidence of pretext to rebut defendants' legitimate, non-

8   retaliatory reasons for the decision to terminate her.  They note that plaintiff's

9   insubordination and poor performance were well-documented, and that plaintiff admitted in

10  her deposition that she missed many hours of work for countless reasons unrelated to her

11  disability.  They claim that the evidence shows that although both Hoffman and Ireland

12  attempted to address the performance and absenteeism problems with plaintiff and to offer

13  guidance on how to avoid the problems in the future, plaintiff responded by being

14  defensive, dismissive, and insubordinate.

15       In opposition, plaintiff argues that she has shown a causal connection to establish a

16  prima facie case – that is, she filed the DFEH and EEOC complaints on August 11, 2003;

17  Hoffman held a disciplinary meeting with plaintiff on August 20, 2003, where plaintiff

18  complained about disability discrimination; Hoffman issued a letter of warning on

19  September 8, 2003; on September 9, 2003, another disciplinary meeting was held, and

20  again plaintiff complained about lack of accommodation and harassment; on January 6,

21  2004, plaintiff was given a performance evaluation stating "needs improvement;" on April

22  16, 2004, plaintiff was terminated.  Plaintiff argues that this is sufficient evidence for nexus.

23       The court finds that the motion must be GRANTED.  Plaintiff has arguably

24  established her prima facie case – she engaged in protected activity (filing DFEH/EEOC

25  charges and requesting accommodation for her asserted disability); she was later

26  subjected to an adverse employment action (termination); and a causal connection may be

27  inferred by the temporal nexus between those two.  However, defendants have established

28  a legitimate, nondiscriminatory reason for the termination, and plaintiff has failed to provide

United States District Court

For the Northern District of California

1    any evidence that the articulated reason was pretextual – let alone "specific, substantial

2    evidence of pretext."  There is no dispute that plaintiff had numerous performance

3    problems, along with excessive absences that were unrelated to health or medical issues.

4    Plaintiff fails to even address the question of pretext.

5              b.    FMLA/CFRA

6         Under both FMLA and CFRA, a plaintiff can establish a claim for "retaliation" by

7    demonstrating that she was terminated on account of her having taken a leave.  See

8    Dudley v. Department of Transp., 90 Cal. App. 4th 255, 261 (2001).  In FMLA cases, such

9    claims are referred to as claims of "interference with rights" under the FMLA.  The elements

10   of an "interference" claim are 1) entitlement to the FMLA right, 2) the employer's

11   interference with that right, and 3) a causal connection between the interference and the

12   harm.  Batchelder v. American West Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001).

13        To establish retaliation in violation of CFRA, a plaintiff must show that (1) the

14   defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to

15   take CFRA leave; (3) the plaintiff exercised her right to take leave for a qualifying CFRA

16   purpose; and (4) the plaintiff suffered an adverse employment action, such as termination,

17   fine, or suspension, because of her exercise of her right to CFRA leave.  Dudley, 90 Cal.

18   App. 4th at 261.

19        Defendants argue that summary judgment should be granted on these claims

20   because it is undisputed that defendants granted all plaintiff's requests for leave under the

21   FMLA/CFRA.  They assert that she was reprimanded for taking excessive, unscheduled

22   absences that were not FMLA-related, and was never reprimanded for taking any FMLA

23   leave.  They note that plaintiff began taking FMLA leave nearly four months after Ireland

24   issued the 2002 performance evaluation, but was not terminated until two years later.

25   Moreover, defendants assert that the evidence shows that plaintiff was terminated because

26   of her performance problems and insubordination, not her attendance problems.

27        In opposition, plaintiff argues that the evidence shows that defendants treated her

28   "differently" when she returned from FMLA leave.  However, she does not say what this

46

1   evidence is.

2        The court finds that the motion must be GRANTED.  Plaintiff has not shown any

3   causal connection between her taking the FMLA leave and her termination, and has also

4   failed to show that the Regents' legitimate, nondiscriminatory reasons for termination were

5   pretextual.

6                                    **CONCLUSION**

7        In accordance with the foregoing, the court GRANTS defendants' motion for

8   summary judgment.

9

10  **IT IS SO ORDERED.**

11  Dated:  May 1, 2006

12                                        _____
                                          PHYLLIS J. HAMILTON
13                                        United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

47